MARTIR, DEMANDANTE Y APELANTE, *v.* PÉREZ, DEMANDADO Y APELADO

No. 3200.—*Visto:* Abril 4, 1924.  *Resuelto:* Agosto 2, 1924.

COBRO DE DINERO—DAÑOS Y PERJUICIOS—PRECIO APLAZADO—CAUSA DE ACCIÓN.—Estando subordinado el pago del precio aplazado, según el contrato, al otorgamiento de una escritura libre de gravámenes, el vendedor carece de acción para reclamar dicho precio y daños y perjuicios antes de otorgar la escritura como quedó obligado.

COMPRAVENTA DE FINCA QUE RESULTÓ HIPOTECADA—RESCISIÓN DEL CONTRATO--CAUSA DE ACCIÓN.—No especificando el contrato de compraventa que la finca estuviera libre de gravámenes, ni demostrando la prueba que el vendedor ocultó al comprador la existencia de una hipoteca sobre la finca, ni que la hipoteca no estuviera inscrita al otorgarse la venta; y no apareciendo, finalmente, que el contrato dependiera de que la propiedad estuviera libre del gravamen que más tarde fué cancelado, y no siendo tampoco satisfactoria la prueba de los perjuicios alegados en la contrademanda, es preciso concluir que el comprador no tenía causa de acción para pedir la rescisión y daños, amparado en el artículo 1091 del Código Civil.

SENTENCIA de *Tomás Bryan*, J. (Aguadilla), declarando sin lugar la demanda, con costas. *Confirmada y revocada en parte.*

*E. Negrón Benítez,* abogado del apelante; *B. Esteves,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

En este caso el demandante estableció demanda en cobro de dinero y daños y perjuicios, por falta de pago de ciertos plazos del precio de venta envuelto en una negociación de una propiedad inmueble, y por el alegado incumplimiento en pagar dichos plazos a su vencimiento.

El demandado con su contestación archivó una contra-demanda, y la corte después de celebrar un juicio sobre los méritos dictó sentencia a favor del demandado y contrademandante que en substancia es como sigue:

"Por tanto, se declara sin lugar la demanda y se condena al demandante al pago de las costas, desembolsos y honorarios de abogado.

"En cuanto a la contrademanda, la corte resuelve declararla con lugar y, en su consecuencia, decreta la resolución del contrato de venta a que se refiere esta acción, el cual aparece copiado en la demanda y que es el mismo en que se basa la contrademanda ordenándose, que el contrademandado Agustín Mártir Vientos devuelva al contrademandante Leocadio Pérez los $400 que recibió de éste a cuenta del precio de la venta objeto del referido contrato, con sus intereses legales desde el 31 de diciembre de 1920, y que el contra-demandante entregue al contrademandado la finca rústica de diez y seis y media cuerdas de terreno (describiéndola), entregándole además los frutos de dicha finca, de acuerdo con las disposiciones del Código Civil (artículos 1091 y 1262). Se condena, además, al demandante y contrademandado a pagar al demandado y contrademandante la suma de doscientos ($200) como indemnización de perjuicios, de acuerdo con la cláusula 5 del contrato celebrado entre ellos."

De la opinión emitida por el juez sentenciador hacemos la siguiente cita:

"Después de un estudio detenido de las alegaciones de una y otra parte y de la evidencia aportada en el acto del juicio, la corte establece las siguientes conclusiones:

"(a) Que don Agustín Mártir Vientos y don Ricardo Ríos celebraron en San Sebastián, allá en enero de 1920, un contrato de venta de una finca rústica, bajo las siguientes cláusulas y condiciones:

"'1. Don Agustín Mártir asegura ser dueño en pleno dominio de la siguiente finca: (describiéndose). El señor Mártir asegura además, tener los títulos de propiedad debidamente inscritos a su nombre.

"'2. Que ha convenido vender al otro compareciente señor Río la parcela anteriormente descrita con todo cuanto contiene y le es inherente, por la cantidad estipulada y convenida de $200, ahora, a la mano, y el resto de $1,000, con sus intereses correspondientes al 5 por ciento anual, en tres plazos: uno de trescientos dólares el día 31 de diciembre del corriente año 1920; uno de trescientos cincuenta dólares, el 31 de diciembre del año venidero 1921, y otro de trescientos cincuenta dólares, el día 31 de diciembre del año 1922, agregando a cada uno de estos plazos lo que corresponda al tipo de interés fijado de cinco por ciento, de acuerdo con lo convenido;

"'3. El señor Agustín Mártir, queda comprometido a otorgar al señor Río la escritura pública correspondiente de la compraventa de la finca que ya se ha descrito, en cualquiera de los días del mes de diciembre del corriente año 1920, libre de toda carga y gravamen.

"'4. El señor Ricardo Río queda comprometido a otorgar tan pronto reciba la escritura de venta, pagarés a favor del señor Mártir por la suma que se ha estipulado en la cláusula segunda de este contrato.

"'5. Es convenido que cualquiera de las partes contratantes que se arrepintiere, en el futuro, de cumplir debidamente lo estipulado en el presente contrato, indemnizará a la otra parte los daños y perjuicios que sufriere en sus intereses, por falta de cumplimiento.'

"(b) Que dos o tres meses después, don Ricardo Río hizo cesión de sus derechos y obligaciones sobre la finca predescrita por dicho contrato, en favor de don Leocadio Pérez, el aquí demandado y contrademandante, quien quedó subrogado en la persona del comprador con el conocimiento y conformidad del vendedor.

"(c) Que don Leocadio Pérez pagó y don Agustín Mártir recibió, a cuenta del precio de dicha venta, la suma de cuatrocientos dollares, o sean $200 al hacer el negocio y los otros $200 a cuenta del primer plazo, dos o tres días antes del vencimiento.

"(d) Que don Agustín Mártir no otorgó la escritura de compraventa a que se obligó, en el año 1920, ni después.

"(e) Que la finca objeto del contrato soportaba una hipoteca por la suma de $540.34 constituída por Agustín Mártir a favor de un tal José González, hecho que ignoraba Leocadio Pérez al hacer el negocio y que averiguó en marzo de 1921, por lo cual y por no habérsele otorgado la escritura de compraventa, suspendió el pago del precio aplazado; y que dicha hipoteca fué cancelada en 30 de enero de 1922 por escritura número 11 otorgada en San Sebastián, ante el Notario don Eduardo Negrón Benítez, la cual no aparece inscrita.

"(f) Que don Leocadio Pérez estuvo siempre dispuesto a cumplir la parte que le incumbía en el contrato de referencia, y que don Agustín Mártir obró de mala fe y con manifiesta temeridad, al no otorgar la escritura de compraventa y al dejar subsistente el gravamen hipotecario que soportaba la finca, el cual además, no aparece que estuviera inscrito en el registro.

"(g) Que don Leocadio Pérez perdió la suma de doscientos dollars al querer revender la finca que había adquirido del demandante y no poder efectuar su negocio por estar dicha finca hipotecada.

"El demandante basa su acción en el artículo 1091 del Código Civil Revisado, según expresa en el alegato escrito que radicó después del juicio. La corte entiende, que dicho artículo no tiene aplicación a la demanda y que los hechos en ésta contenidos son más bien los de una acción ordinaria en cobro de dinero, cuyos hechos no fueron probados a satisfacción del juez que suscribe.

"Si examinamos detenidamente la prueba del demandante veremos que éste pretendió que el demandado le pagara la totalidad del importe del primer plazo *antes del vencimiento,* y que no obstante ésto, no otorgó nunca la escritura a que se obligó en el contrato. Pretende el demandante explicar esto diciendo que fué a la casa del demandado con un tal Rafael García, con el fin de otorgar dicha escritura y de cancelar la hipoteca que pesaba sobre la finca (de la cual no tenía noticias todavía el demandado) y que el demandado se negó a ello; pero la corte no ha dado crédito alguno a estas manifestaciones. Después de diciembre de 1920 no hay por parte del demandante ninguna otra gestión de cobro, hasta junio o julio en que, según el testigo Salvador García, encuentra al demandado en la carretera cargando unos cascajos y le invita a arreglar el asunto. Sin embargo, es extraño que a esta fecha todavía no hubiera el demandante otorgado la escritura de compraventa ni cancelado el gravamen que pesaba sobre la finca. Más bien podría decirse, que estaba 'sacándole el cuerpo', como se dice vulgarmente, por más

que ya el demandado se le había quejado de haber perdido un ne-
gocio de reventa por culpa de estar la finca hipotecada.

"No podemos pasar por alto el hecho de que el demandado se
había ido a residir a Santurce (San Juan) desde agosto de 1921
y que después de esta fecha volvió a San Sebastián en octubre del
mismo año con el fin de ver a su familia, regresando a Santurce a
los dos días; y que luego volvió en febrero de 1922, cuando le em-
plazaron y le notificaron el embargo de sus bienes, en esta acción,
diligencias que aparecen hechas y firmadas, (según los autos) por
el márshal de la corte de distrito de San Juan, Primer Distrito, el
día 16 de febrero de 1922 a las 2 de la tarde, en Santurce, calle de
Cerra No. 63, personalmente a don Leocadio Pérez. Aceptando esto
como cierto, no es posible que el demandante requiriera de pago al
demandado el 31 de diciembre de 1921. Y es después que recibe
una carta del abogado del demandado (en enero de 1922) cuando el
señor Mártir se mueve otra vez en el asunto y concluye por llevar
a los tribunales a Leocadio Pérez, quien, a pesar de todo, parecía
ganoso de evitar este paso.

"La corte no abriga la menor duda de la temeraria actitud del
demandante. Y está plenamente convencida de que éste no cum-
plió sus obligaciones en el contrato sobre que se funda esta acción.
Siendo esto así, no tiene derecho a exigir el pago del precio apla-
zado y carece de acción para obligar al demandado.

"Los términos del contrato (que hemos transcrito) son bien cla-
ros y no hay duda alguna respecto a la intención de las partes. La
cláusula 3 dice:

" 'El señor Agustín Mártir, queda comprometido a otorgar al
señor Río la escritura pública correspondiente de la compraventa de
la finca que ya se ha descrito, en cualquiera de los días del mes de
diciembre del corriente año 1920, libre de toda carga y gravamen.'

"Y la cláusula 4 dice:

" 'El señor Ricardo Río queda comprometido a otorgar, tan
pronto reciba la escritura de venta, pagarés· a favor del señor
Mártir por la suma que se ha estipulado en la cláusula segunda de
este contrato.' "

"Como se ve, don Agustín Mártir tenía la obligación de otor-
gar la escritura de compraventa *libre de toda carga o gravamen,*
en cualquiera de los días de diciembre de 1920. No tenía que es-
perar a que el comprador le hiciera el pago del primer plazo. Y
es después de cumplida esta condición por el señor Mártir cuando
surge en el señor Pérez la obligación de otorgar los pagarés por el
importe del precio aplazado. ¿Era posible para el señor Mártir

otorgar dicha escritura en la forma convenida estando la finca hipotecada, sin que lo supiera el señor Pérez?

"Entendemos, que los términos del contrato referido son perfectamente claros y que no dejan duda sobre la intención de los contratantes, por lo que tenemos que sujetarnos al sentido literal de sus cláusulas. (Art. 1248 del Código Civil.)

" "(Véase a este respecto lo que dice Manresa comentando este artículo, que corresponde al 1281 del Código Civil Español, en su obra Comentarios al Código Civil, tomo 8, página 704; y las sentencias del Tribunal Supremo de España de 15 de diciembre de 1871; 21 de junio de 1872 y 30 de junio de 1890.)

"En su contestación el demandado alega que nunca fué requerido por el demandante para el otorgamiento de la escritura a que se obligó en el contrato; que al vencer el primer plazo entregó al demandante $200 a cuenta de los $300 y le requirió para que le entregara la escritura de venta, según contrato, libre de toda carga, reteniendo en su poder $100 hasta que se otorgara dicha escritura; que el demandante no canceló un gravamen que apareció luego en la finca durante el año 1921, por cuyo motivo el demandado se negó a seguir haciendo pagos, hasta tanto desapareciera el gravamen referido, etc.

"Se funda esta defensa del demandado en el artículo 1405 del Código Civil Revisado que dice:

" 'Art. 1405.—Si el comprador fuere perturbado en la posesión o dominio de la cosa adquirida, o tuviere fundado temor de serlo por una acción reivindicatoria o hipotecaria, podrá suspender el pago del precio hasta que el vendedor haya hecho cesar la perturbación o el peligro, a no ser que afiance la devolución del precio en su caso, o se haya estipulado que, no obstante cualquiera contingencia de aquella clase, el comprador estará obligado a verificar el pago.'

"No se trata en este caso de una hipoteca inscrita, ni se hizo constar en el contrato que la finca estuviera gravada, ni se le informó a don Leocadio Pérez. Es en marzo de 1921 cuando, con motivo de tratar de verificar una reventa de la finca, descubre el gravamen y se queja entonces el señor Mártir por haberle hecho fracasar un negocio en que se hubiera ganado doscientos dollars.

"Aplicando a este caso los claros preceptos del art. 1405, precopiado, no hay duda de que don Leocadio Pérez procedió correctamente al suspender el pago del precio aplazado de la finca en cuestión, por temor a ser perturbado en su posesión con una acción hipotecaria.

"Por tales motivos, y especialmente, por no haber el demandante cumplido sus obligaciones en el contrato, cree la corte que procede justamente desestimando la demanda e imponiendo al demandante las costas y honorarios de abogado. Y, en cuanto a la acción de daños y perjuicios establecida por el demandante, cree la corte que no hay base para declararla con lugar y ha resuelto también desestimarla.

"Consideremos ahora la contrademanda. Pide en ella el contrademandante que se decrete la resolución del contrato de venta a que se refiere esta acción, por no haber cumplido el contrademandado lo que le incumbía de acuerdo con los términos de dicho contrato, y que se proceda según las disposiciones del art. 1262 del Código Civil Revisado y, además, que se condene al contrademandado a pagar al contrademandante la suma de doscientos dólares por daños y perjuicios.

"Se funda esta acción en las disposiciones de los artículos 1386 y 1091 del Código Civil Revisado.

"Dudamos si en este caso son de aplicación las disposiciones del artículo 1386, pues según su último apartado, la acción rescisoria podrá ejercitarla el comprador durante un año, a contar desde el otorgamiento de la escritura; y como en este caso no se ha otorgado la escritura falta base para computar el término a que se refiere dicho artículo.

"Pero no hay duda alguna, que es de aplicación el artículo 1091 que corresponde al 1124 del Código Civil Español.

" 'Art. 1091:—La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.

" 'El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aún después de haber optado por el cumplimiento, cuando éste resultare imposible.'

"Ya hemos dicho, que don Agustín Mártir no cumplió sus obligaciones en el contrato y, por tanto, don Leocadio podía escoger entre exigirle el cumplimiento o pedir la resolución de la venta, con el resarcimiento de daños y abono de intereses."

Para los fines de esta opinión puede admitirse que el demandado no estaba obligado a pagar antes del ofrecimiento de una escritura de venta de la finca en cuestión libre de

gravámenes; y que no existe un error tan manifiesto en la apreciación de la prueba en este sentido que justifique la revocación de la sentencia en lo que respecta a la desestimación de la demanda presentada por el actor. Pero no podemos convenir con la conclusión de que el demandante debe ser condenado al pago de costas, desembolsos y honorarios de abogado.

Ni tampoco encontramos ninguna ventaja que pueda apreciarse en favor del demandado en cuanto a la buena fe, honradez y móviles, o condición para cumplir con las estipulaciones y condiciones del contrato.

El contrato de compraventa no especifica el hecho de que la finca estaba ya libre de gravámenes, ni tampoco vemos nada que justifique tal cosa. No hay la más leve prueba que demuestre que se ocultó a Ríos la existencia de una hipoteca, o que él no lo supiera. Su única manifestación en cuanto a esto, hecha como testigo del demandante, dice así:

"Cuando le cedí la finca a Leocadio Pérez, el traspaso que le hice fué de acuerdo con las condiciones del contrato con que le compré a Mártir. Yo no le informé a Leocadio Pérez que la finca estaba hipotecada a favor de González porque yo le vendí con las mismas condiciones con que compré, pues según compré vendí, y el señor Pérez se conformó con aceptar el mismo negocio que yo hiciera con Mártir."

Dicho testigo no fué repreguntado sobre este punto ni tampoco de modo alguno por el demandado.

La cancelación de la hipoteca expresa que estaba inscrita, citando el tomo y la página pero no la fecha del asiento. No hay nada que demuestre que no estuviere inscrita al otorgarse el contrato de compraventa celebrado por Ríos, pero si lo fué o nó, o si el demandado en este caso tenía o nó conocimiento de su existencia es cuestión sin importancia toda vez que el contrato de compraventa, como ya se ha indicado, no dependía, ya por inferencia, o de otro modo, del hecho de que la propiedad estuviera libre de gravamen al tiempo de celebrarse el contrato.

La prueba de los daños y perjuicios que se alegan han sido sufridos por el demandado con motivo de la pérdida de una reventa es muy poco satisfactoria. La declaración del demandado en cuanto a este punto es como sigue:

"Averigüé que la finca estaba hipotecada en marzo de 1921, cuando tenía proyecto un negocio de venta de la finca con mi hermano. No pude vender la finca porque estaba hipotecada. Mi hermano Juan Bta. Pérez me daba $1,400.00 por la finca, $400 en el acto de la venta y el resto en dos plazos de $500.00 cada uno en cada uno de los meses de diciembre de 1921 y 1922. Dicho negocio no pude hacerlo porque no tenía la escritura y fuí donde el Sr. Mártir para que me la diera y éste me dijo que la escritura la tenía José González que esperaba el sábado para hacérmela, que José González sólo se encontraba en el pueblo de San Sebastián de viernes a lunes de cada semana. Entonces le dije a mi hermano Juan Bta. Pérez que si podía aguardar al sábado para efectuar el negocio de la venta de la finca y éste, mi hermano, me dijo que no podía aguardar.

＊          ＊          ＊          ＊          ＊          ＊          ＊

"Averigüé que la finca estaba hipotecada cuando fuí a pedirle la escritura a Mártir y éste me dijo que la finca tenía una hipoteca a favor de José González, que aguardara al sábado para darme la escritura que sería cuando González se encontraría en San Sebastián. Yo estaba dispuesto a cumplir con el contrato en cuestión en diciembre de 1920 y a principio de 1921, porque no sabía que la finca estaba hipotecada.

＊          ＊          ＊          ＊          ＊          ＊          ＊

"Exigí de Agustín Mártir en marzo de 1920, cuando tenía el negocio con mi hermano Juan Bta. Pérez con la finca, que me entregara la escritura. El negocio de venta que hice con mi hermano de finca fué por el precio de $1,400.00, $400.00 en el acto de realizarse el negocio y los $1,000.00 restantes en dos plazos, y por causa de no tener la escritura no llevé a efecto el negocio con mi hermano Juan Bta. Pérez.

"Supe que la finca estaba hipotecada, porque Mártir me lo dijo cuando fuí a su casa para que me la diera (la escritura), y éste me dijo que aguardara hasta fines de semana que viniera José González a quien tenía hipotecada la finca. Esto fué en marzo de 1920, y entonces mi hermano se arrepintió del negocio."

La manifestación del hermano es así:

"Mi hermano Leocadio Pérez y yo hemos tenido varios negocios de fincas, le he comprado varias fincas. Ahora teníamos un negocio con esa finca 16½ cuerdas del barrio de Piedras Blancas. Digo que el negocio fué ahora porque fué el último que hemos hecho. El referido negocio fué en enero de 1921, en marzo de 1921. Fué en marzo del 21. Ese negocio consistió en que él me vendió la finca por $1,400.00 pagándole yo $400.00 de pronto y $1,000.00 en dos pagos de $500.00. El negocio se efectuó, pero a los dos o tres días supe que la finca estaba hipotecada y desistí del negocio. Luego le compre otra finca porque no podía hacer el negocio con esa. Mi hermano estaba vendiendo la finca para irse para Santurce. El se fué en agosto de 1921.

"A las repreguntas del abogado del contrademandado contesta:

" 'Volteé la finca antes de comprarla, en marzo de 1921, con mi hermano Leocadio Pérez y un peón que el tenía allí arrimado que yo no se si era Ramón Mercado o Juan o Pedro. Ese peón o arrimado no era Ramón Mercado, era otro que mi hermano tenía allí.'

"Desistí del negocio con mi hermano porque me dijeron que la finca estaba hipotecada y yo, mis chavos cuando los meto los meto limpios. El peligro que había en eso es que yo fincas que están hipotecadas no las quiero, el peligro que había en eso es que yo no expongo mis chavos nunca."

Resulta, pues que el impedimento no era la petición de una prórroga por dos o tres días, en tanto tratamos del alegado cambio de parecer del hermano, sino la existencia de la hipoteca que el vendedor ofreció cancelar como incidental al cumplimiento de su obligación.

La esencia de la contrademanda es esta omisión a otorgar una escritura inmediatamente que se pidiera en marzo de 1921. Todas las anteriores omisiones y faltas, de existir algunas, fueron y son renunciadas para todos los fines prácticos. El requerimiento del demandante en diciembre de 1921, de acuerdo con su misma declaración fué hecho por carta después de dos o más conversaciones con la esposa del demandado en San Sebastián de quien el demandante obtuvo la dirección del demandado en Santurce. No hubo ninguna alegación acerca de una entrevista personal entonces con el

demandado. El demandado admite el recibo de la carta que refirió a su abogado. Este entonces dirigió una comunicación al demandante y la radicación de la demanda siguió a esto.

El arrendatario del demandado, en posesión aparentemente desde una fecha anterior a la alegada negociación fracasada con el hermano, dice que éste nunca visitó ni examinó la propiedad como afirmó en su declaración: Todas las circunstancias indican el propósito deliberado, que parece haber sido confesado por el demandado en junio de 1921, de sacar de la propiedad lo que le había costado y que lo demás se lo llevara el diablo.

No consta que el demandado en ningún momento antes de la radicación de la demanda ofreciera entregar la posesión o de otro modo restablecer el *statu quo*. El tiempo dentro del cual el demandante había de otorgar una escritura apenas si puede considerarse como la parte esencial del contrato; y el incumplimiento técnico, si alguno hubo por parte del demandante no era uno que afectaba a la base del contrato. De todos modos el único incumplimiento de que se queja el apelante, si no por la subsiguiente conducta, y que no fué renunciado anteriormente, fué a lo sumo *damnum absque injuria*. El demandante nunca se ha negado, sino por el contrario lo menos que podemos decir es que ha estado tan dispuesto como lo estuvo el demandado a cumplir con su parte del contrato.

Atendidas todas las circunstancias no encontramos nada peculiar en la mera omisión en cancelar la hipoteca o entregar una escritura con anterioridad al requerimiento hecho en junio, 1921; y prescindiendo de la calificación de esta omisión como "rara" no existe ningún comentario por parte del juez sentenciador respecto a la prueba en relación con el esfuerzo hecho por el demandante para obtener el cumplimiento mutuo de las obligaciones entonces existentes.

Dentro de las circunstancias y asumiendo como lo hacemos, que la corte inferior estaba justificada al no aceptar

como cierta en todo sentido la prueba testifical del demandante, el caso parece ser especialmente uno en el cual las partes deben quedar en la misma situación en que estaban al tiempo de radicarse la demanda, debiendo cada una pagar sus propias costas; y de paso puede decirse que si los abogados deben ser compensados debidamente por el tiempo y el trabajo ya empleado, sus honorarios probablemente excederían de la suma en controversia.

*Debe confirmarse la sentencia apelada en tanto se trata de la desestimación de la demanda del actor, y en todos sus demás pronunciamientos revocarse; y en lugar de tales pronunciamientos debe dictarse sentencia por este tribunal desestimando la contrademanda y ordenando que cada una de las partes pague sus propias costas, desembolsos y honorarios de abogado.*